---

## MULLIGAN v. THOMPSON BROS.

(Supreme Court, Appellate Division, First Department.    March 10, 1911.)

1. MASTER AND SERVANT (§ 128*)—INJURIES TO SERVANT—NEGLIGENCE.
    Even if the driver of a coal wagon, while loading coal on a wagon which was dumped into it from a bucket raised by a derrick, was injured by the giving way of the extension tailpiece of his wagon which he fell against while reaching to touch the spring to dump the bucket of coal, his employer would not be liable if the tailpiece was sufficiently strong to serve its purpose to support the coal, as he was not bound to provide tailpieces strong enough to support greater strains, such as that to which it was subjected by the driver falling against it.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 256; Dec. Dig. § 128.*]

2. MASTER AND SERVANT .(§ 129*)—INJURIES TO SERVANT—PROXIMATE CAUSE.
    In order to make the insecure tailboard the proximate cause of the driver's injuries, it must have been probable that he would not have fallen so as to be seriously injured if it had not given way when he took hold of it.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. § 129.*]

3. MASTER AND SERVANT (§ 233*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.
    If the driver of a coal wagon who was injured by the giving way of the tailpiece of his wagon, himself selected an unsafe tailpiece when safe ones were provided by the employer, the latter would not be liable for the resulting injuries.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 701; Dec. Dig. § 233.*]

Appeal from Trial Term, New York County.

Action by Edith Mulligan, as administratrix of Matthew Mulligan, deceased, against Thompson Bros. From a judgment for plaintiff and an order denying a motion for a new trial, defendant appeals. ' Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and MILLER, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

E. Clyde Sherwood (Joseph F. Murray, on the brief), for appellant.

Wm. Edgar Weaver, for respondent.

LAUGHLIN, J.  This is a statutory action to recover for the death of Matthew Mulligan alleged to have been caused by the negligence of the defendant, who was his employer.  The defendant is a domestic corporation and was engaged in the general trucking business in the city of New York, and owned and used in said business a great number of horses, wagons, and trucks, and employed many drivers. On the 22d day of December, 1909, the defendant was engaged in hauling coal from the barge Albatross, which was moored at a dock at the foot of 149th street and the Harlem river, to the Ebling Brewing Company.  The coal was hoisted from the barge in buckets by a hoisting apparatus, known as a "catamaran," and horse power.  A derrick was so placed that as a bucket of coal was being hoisted the boom swung around slowly, bringing the bucket directly over the wagon. The height to which the coal was elevated depended on how far the team was driven away from the catamaran.  It could readily be elevated, stopped, or lowered by the driver of the team furnishing the power for hoisting.  The team was taken from each wagon in turn for hoisting, but another driver, regularly employed for that purpose, guided the team during the hoisting.  Three buckets were employed, and, while one was being hoisted and dumped on a wagon backed up to the edge of the dock, others were being filled by hand on the barge and wheeled into position to be hoisted.  It was customary for the driver of the wagon to stand on the wagon to trip or dump the bucket by touching a latch which permitted the bucket, owing to the great weight of its nose, to turn bottom up.  The wagons were usually employed in hauling brick and like material, and the permanent wagon boxes were suitable for these purposes; but they were not sufficiently high to haul coal economically.  The defendant had on hand in its barn side and end extensions to be attached to the permanent wagon boxes for use in hauling coal and other material, which required larger and higher boxes than were needed in hauling brick.  A set consisted of two side and end extensions, and defendant had provided about 40 separate pieces, or 10 sets.  These side and end boards were provided with cleats nailed upon either side, which extended down over the sides and ends respectively of the permanent box and thus held the extensions in place, and heightening the box by the width of the extensions.

It is undisputed that the side and front end extensions each had two sets of these cleats, and many witnesses testified that tail end extensions had the same number; but it is contended in behalf of the respondent that Exhibit A, which is a photograph of one of defendant's wagons taken upwards of a week after the accident, shows only a single set of cleats on the tail end extension.  When it became necessary to use the wagons in hauling coal, it was the duty of the drivers to select the side and end extensions and attach them to the permanent box on their respective wagons.  If the driver discovered that

any of these extension pieces were broken or out of repair, it was his duty to have them repaired or to have new extension pieces made in the defendant's repair shop which was near by. The accident occurred on the 22d day of December, 1909. On the morning of that day, one Tully, who was regularly in the employ of the defendant as a driver, was directed to go to this dock and haul coal. Evidently other teams had been engaged in unloading the barge before that day. Tully selected side and end extension pieces and attached them to the box on his wagon and drove to the dock. On arriving there he became ill, and seeing the deceased, Mulligan, on the dock, and knowing that he had worked for the defendant as a teamster on other occasions, he asked him to drive the truck and work for him that day. The decedent assented, and Tully left the team and wagon in his charge. Before the accident, the vice president and general manager of the defendant came to the dock and saw the decedent on the wagon, and, on inquiring, he ascertained, in substance, that the regular driver, Tully, had left him in charge of the team and truck, and made no objection.

On the part of the plaintiff, testimony was given by one witness tending to show that decedent was standing on one of the hind wheels as a bucket of coal was being hoisted, and shouted to the boy driving the team and operating the catamaran to stop and come back—evidently meaning to lower the bucket—but that the boy did not stop the team, and the bucket kept going higher, and the decedent stepped upon the wagon and attempted to reach the bucket, and, losing his balance, fell against and grabbed hold of the extension tailboard of the wagon box, which gave way, and he went down outside the wagon and lodged between the boat and the dock; and, by the testimony of another witness, that the tailboard broke, and that its appearance along the line of the break indicated that the wood was poor and rotten; and, by another witness, that shortly after the accident the tailboard extension was not in place, and either the old one or another was put in. It was shown generally that the photographs, Exhibits A and B, were fair representations of defendant's wagons used in hauling coal, and it is claimed, as already stated, that they show that the tailboard extension on the wagon photographed, which is not shown to have been the same as that on which the accident occurred, has only one set of cleats. If the tailboard extension had only one set of cleats, and that had anything to do with the accident, it would seem that it might have been shown by the witness, who claims to have found a broken tailboard on the dock shortly after the accident, that the tailboard he found had only one set of cleats and where it was broken with reference to these cleats; for if he observed it with sufficient care to determine the quality and condition of the wood, as he testified, it would seem that he would know about the cleats, and thus it would not be necessary to ask us, merely on appearances indistinctly shown on a photograph, to permit a verdict to stand which on this point impeaches the express testimony of several witnesses who could not well be mistaken, and, if their testimony be not true, it must have been willfully false.

On the part of the defendant, it was shown by the testimony of seven witnesses, several of whom were apparently disinterested and wholly unimpeached, that the decedent was engaged in an animated conversation with his brother, who was in the hold of the coal barge, and that, during or after the exchange of insulting remarks between them, the decedent was in the act of throwing a lump of coal at his brother, when he lost his balance and fell; and considerable evidence was also given on the part of the defendant by eyewitnesses showing that the extension tailpiece did not break, but that decedent fell out over the end entirely clear of it.

A notice of claim was served by the plaintiff under the employer's liability act (chapter 600, Laws of 1902); and negligence is predicated on the fact that the decedent was directed or permitted to work on a wagon with a defective or insecure tailpiece.

We are of opinion that the plaintiff failed to bear the burden of showing by a preponderance of the evidence that the decedent lost his balance and fell from the wagon while in the performance of duties for his employer, and therefore the verdict should not be permitted to stand. We are also of opinion that, on the most favorable view of the evidence, the plaintiff failed to establish a cause of action. Assuming that the decedent, while attempting to perform his duty to touch the spring to dump the bucket of coal, lost his balance and fell against and grabbed hold of the extension tailpiece, and that it gave way with him; still we think the defendant would not be liable. It was not shown that the extension tailpiece was not sufficiently strong and securely held in place to support the load of coal. The decedent had hauled two loads with it before the accident, which tends to show its adequacy for that purpose. The defendant was not obliged to provide extension pieces of sufficient strength to resist the strain to which it was subjected by the decedent falling against it heavily, or with great force—as the only witness who claims that he came in contact with it at all testified—and grabbing hold of it. The employer was not obliged to foresee and guard against an accident of this kind. In the ordinary operation of the derrick, the bucket of coal would be swung over the wagon where the driver could conveniently touch the spring and dump it without losing his balance, and, if on this occasion it did not come within convenient reach of the decedent, he might have waited until it was lowered within convenient reach. His duty did not require that he take the risk of losing his balance by an attempt to reach it when it was out of reach, still going up, as some of the testimony tends to show he did.

Moreover, there is no evidence on which a finding that the decedent would not have fallen from the wagon if the tailpiece extension had not given way can be predicated. The primary and proximate cause of the accident was the decedent's losing his balance; and, before it can be said that a defective or insecure tailboard was a contributing cause, there must at least be evidence rendering it probable that he would have been safely held without serious injury if it had not given way. Furthermore, if the decedent had selected an unsafe tailpiece himself, it is quite clear that defendant would not be liable,

if, as appears, it provided suitable and safe ones; and the defendant does not become liable merely because the selection was made by a coemployé. McConnell v. Morse I. W. & D. D. Co., 187 N. Y. 341, 80 N. E. 190, 10 L. R. A. (N. S.) 419.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.